UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID GRIFFIN,

          Petitioner,

    v.

CONNIE GIPSON,

          Respondent.

No.  2:13-cv-02516-MCE-GGH

FINDINGS AND RECOMMENDATIONS

INTRODUCTION AND SUMMARY

Petitioner is a state prisoner proceeding *pro se* with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted of robbery in concert, burglary, aggravated kidnapping, conspiracy to commit murder, and attempted murder; each included enhancements for firearm use and committing the offenses for the benefit of a criminal street gang.  He was also convicted of active participation in a criminal street gang.  Petitioner was sentenced to a prison term of 19 years 8 months, plus 65 years to life.  Petitioner challenges his conviction on due process grounds as follows: 1) prosecutorial misconduct in rebuttal closing argument; 2) prosecutorial misconduct regarding alleged misstatements of law; and 3) insufficient evidence of a conspiracy to commit murder.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

1

BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> At all times relevant to this matter, defendants Zachary Tyler, David Griffin and Lashea Merritt were members of a criminal street gang called the 29th Street Crips, which is based in South Sacramento. Tyler's gang name was "Smash," Merritt was called "Lady Smash," and Griffin went by the name of "Baby Attitude." Defendant Jordan Kidd was a member of the Valley High Crips, which is an "ally" of the 29th Street Crips. His gang name was "Five." Defendant Kimberly Knorr was an "associate" of the 29th Street Crips who was in a dating relationship with Kidd. Her gang name was "Lady Five."
>
> In January 2007, Destiny Doe and Knorr were living at the residence of Nate E. in Sacramento. Doe worked as an assistant preschool teacher while also moonlighting as a prostitute for Nate's "escort" service. Knorr also worked for Nate. While they lived together, Knorr often bragged to Doe about things she and her "Crip homies" did together.
>
> On the evening of January 22, 2007, Doe and Knorr were returning home in Doe's car when Doe received a call from Nate telling her Knorr had been kicked out of the residence and not to bring her to Nate's house. Doe dropped Knorr off at a gas station on the corner of Fruitridge and Franklin Boulevard.
>
> Knorr's sister, B.K., was dating Tyler at around this time and, on the evening of January 22, was with him at the home of A.S., who was Merritt's mother and was known by the gang name of "Mama Solo." Also present were A.S., Griffin, Kidd, Merritt, and Merritt's brother, L.M., who is known as "Baby Solo."
>
> After Knorr was dropped off, she called B.K. and told her she had argued with Nate and was moving out of his residence. Knorr said she had been dropped off by Doe and needed a ride to pick up her things. Tyler drove to Knorr's location and brought her back to the A.S. residence.
>
> When Knorr arrived, she was upset and said Nate had insulted the gang. In particular, Knorr told them Nate had said, "fuck them— fuck Smash and them. They're not no 29th Street Garden Block Crips." Garden Block Crips is another name for the 29th Street Crips.
>
> The others in the room jumped up and "started talking shit to one another about—about it." Tyler said, "fuck that nigga, let's go smoke him." In gang culture, to "smoke" means to kill. Tyler also said they should rob Nate. Tyler, Kidd, Griffin, Knorr, Merritt and L.M. departed in two cars, a white and a blue Buick.

2

Meanwhile, Doe had returned to Nate's residence and was resting in her room. Nate was also present. Later, Doe heard a disturbance in front of the residence caused by a prior girlfriend of Nate named Mia. When Doe first moved into the house, Knorr and Mia were also living there, but Mia had since moved out. On this evening, Mia was banging on the window and trying to get Nate to come outside and talk with her. Doe got up and moved to what had been Knorr's bedroom, which was toward the back of the residence. She fell asleep on Knorr's bed.

Some time later, Doe awoke and saw a silhouette outside the bedroom window. She then saw four or five people wearing bandanas enter the bedroom through the window. They pointed guns at her and told her not to say anything. Doe was held at gunpoint while others searched the residence for Nate, who had fled upon seeing what was happening. Doe was told to get dressed and was taken into the living room. Meanwhile, the intruders took off their bandanas and rummaged through the house looking for things to steal. Doe heard the names Smash and Five mentioned and saw the intruders put clothes and a stereo inside a sheet which they later took with them.

When the intruders departed, they took Doe as well. She got into the blue Buick with three of them, and they followed the white Buick away from the scene. Doe later identified the three in the car with her as the one called Five along with Griffin and Merritt.

They all stopped at an apartment complex on 29th Street that had been the birthplace of the gang. Tyler took Doe aside and said to her that "you're with us now and I'll take care of you, and why don't you work for me?" They later got back in the cars and drove away, telling Doe they are the "mob" and this is the "mob life" and "you're with the mob now."

They eventually arrived at the home of A.S., where Doe was taken inside. She saw Knorr, B.K., A.S., another woman and a young boy, as well as the others from the home invasion. Doe was taken to a bedroom, where Tyler, Kidd and Griffin talked about "running a train" on her and forcing her to perform oral sex. Tyler yelled at Doe, "you're gonna suck up all my homies," and Kidd and Merritt ordered her to orally copulate "Little Homie." Merritt further said, "give my little homie some head, you're a ho anyway." Tyler told Doe she was going to go out and start making money for him.

Doe was eventually told she had to orally copulate L.M. and was left alone in the room with him. She did as directed and, after eight minutes or so, L.M. departed. Tyler then came in the room and forced Doe to orally copulate him as well.

Later that evening, Doe was again placed in the white Buick and departed with Tyler, Kidd, Griffin, and Knorr. It is unclear whether Merritt accompanied them on this trip. Kidd and Griffin were both armed with handguns. Before leaving, B.K. overheard Kidd and Tyler say, "If somethin' is gonna be done, the bitch has gotta be

iced." She also heard Tyler say something to A.S. like, "we brought the bitch here so she couldn't tell."

After stopping at another residence for 15 or 20 minutes, they drove to an area near railroad tracks and an empty field. Doe was told to get out of the car and to start walking through the field. She did as directed. After a while, Doe started hearing gunshots. She began walking faster and then running and continued to hear gunshots. She also saw bullets hit the ground around her. One of the shots hit Doe in the back just below the shoulder blade.

Doe ran toward the light of a house and eventually reached the house, where she yelled for help. A man came outside, saw Doe and carried her onto the porch. He called 9–1–1 for help. Doe told the man the 29th Street Crips had shot her.

According to the prosecution's gang expert, all of the foregoing actions of the defendants were for the benefit of the 29th Street Crips.

On February 3, 2007, police officers contacted Tyler and Merritt in a hotel room. They found a handgun and ammunition in the room. On February 13, police officers found Griffin in a residence along with a gun and ammunition. On February 28, police officers discovered Kidd in a residence with a handgun and ammunition.

All five defendants were charged with robbery in concert, burglary, aggravated kidnapping, conspiracy to commit murder, and attempted murder. On each offense, they were further charged with enhancements for firearm use and committing the offenses for the benefit of a criminal street gang. They were also charged with a separate offense for active participation in a criminal street gang.

[¶] . . .[¶]

The case was tried to two juries, one for Kidd alone and the other for the remaining defendants. After his arrest, Kidd had been interviewed by police, and the videotape of that interview was played to his jury alone. In that interview, Kidd first denied any involvement in the matter. However, he eventually admitted he went to Nate's house, but only to steal something and not to kidnap or shoot anyone. He denied kidnapping or shooting anyone. He also denied having a gun and claimed that he departed with Knorr before the others came out of the house and did not know Doe had been taken with them. He denied accompanying the others to the home of A.S.

Tyler was the only defendant to testify at trial. He acknowledged that he went with Knorr to Nate's residence that night, but claimed he went there only to allow Knorr to pick up her things. Tyler claimed he waited in the car while Knorr went inside and that Doe came out with Knorr and departed with them voluntarily. Tyler asserted that, when they left, Doe asked to be taken to a school where she met up with some of her "homeboys." Doe got out and spoke with four men. Tyler overheard her say "fuck Nate" and told

4

the guys they could go to his house and take whatever they wanted because she left the front door unlocked. Tyler then drove them to the residence of A.S. and hung out there for a while. Later, Tyler took Doe to meet up with a "date" she had that evening. According to Tyler, that was the last time he saw Doe.

Tyler, Griffin and Kidd were convicted on all charges, and all enhancements were found true.

[¶] . . . [¶]

Griffin was sentenced on the burglary count to the upper term of six years, plus 10 years for the gang enhancement and one year for the firearm enhancement. On an unrelated attempted murder charge on which he had been convicted earlier, Griffin received a consecutive, one-third middle term of two years four months, plus four months for firearm use. On the separate gang charge, Griffin received a one-third middle term of eight months, stayed pursuant to section 654. For conspiracy to commit murder, Griffin received an indeterminate term of 25 years to life, plus a separate term of 25 years to life for the firearm enhancement. On the aggravated kidnapping charge, Griffin received a consecutive, indeterminate term of 15 years to life. Finally, on the charges of attempted murder and robbery in concert, Griffin received further indeterminate terms that were stayed pursuant to section 654. The total sentence imposed on Griffin was 19 years 8 months, plus 65 years to life.

People v. Kidd, 2012 WL 243250, at **1–5 (January 26, 2012). The California Court of Appeal ordered that petitioner be resentenced, but otherwise affirmed the judgment. Id. at *49. On March 27, 2012, petitioner filed a petition for review with the California Supreme Court, which initially granted review, but ultimately dismissed review on October 17, 2013. Resp't's Lod. Docs. 7–9.

On October 21, 2013, petitioner filed a petition for writ of habeas corpus in the Sacramento Superior Court, which was denied on November 14, 2013. Resp't's Lod. Docs. 10, 11. Petitioner filed his federal petition for writ of habeas corpus in this court on December 5, 2013. ECF No. 1.

DISCUSSION

I.       AEDPA Standards

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S.Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784–85, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was

6

1   unreasonable requires considering the rule's specificity.  The more general the rule, the more

2   leeway courts have in reaching outcomes in case-by-case determinations.'" Id.  Emphasizing the

3   stringency of this standard, which "stops short of imposing a complete bar of federal court

4   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

5   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

6   was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

7          The undersigned also finds that the same deference is paid to the factual determinations of

8   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

9   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

10  decision that was based on an unreasonable determination of the facts in light of the evidence

11  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

12  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

13  factual error must be so apparent that "fairminded jurists" examining the same record could not

14  abide by the state court factual determination.  A petitioner must show clearly and convincingly

15  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct.

16  969, 974 (2006).

17         The habeas corpus petitioner bears the burden of demonstrating the objectively

18  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

19  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

20  show that the state court's ruling on the claim being presented in federal court was so lacking in

21  justification that there was an error well understood and comprehended in existing law beyond

22  any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786–787.  "Clearly

23  established" law is law that has been "squarely addressed" by the United States Supreme Court.

24  Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

25  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

26  Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653–54 (2006) (established law not permitting state

27  sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

28  prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

7

1   established law when spectators' conduct is the alleged cause of bias injection).  The established

2   Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

3   controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

4   federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

5          When a state court decision on a petitioner's claims rejects some claims but does not

6   expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

7   the federal claim was adjudicated on the merits.  Johnson v. Williams, 133 S.Ct. 1088, 1091

8   (2013).  However, if the state courts have not adjudicated the merits of the federal issue, no

9   AEDPA deference is given; the issue is reviewed de novo under general principles of federal law.

10  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

11         The state courts need not have cited to federal authority, or even have indicated awareness

12  of federal authority in arriving at their decision.  Early, 537 U.S. at 8, 123 S.Ct. at 365.  Where

13  the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

14  federal court will independently review the record in adjudication of that issue.  "Independent

15  review of the record is not de novo review of the constitutional issue, but rather, the only method

16  by which we can determine whether a silent state court decision is objectively unreasonable."

17  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

18  II.     Prosecutorial Misconduct

19         Petitioner contends that the prosecutor committed misconduct by making disparaging

20  remarks about defense counsel during the rebuttal argument and by misstating the law.

21         A.  Legal Standard

22         A prosecutor's error or misconduct does not, per se, violate a criminal defendant's

23  constitutional rights.  See Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden v.

24  Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464 (1986) (for the purposes of federal habeas corpus

25  review, the standard of due process applies to claims of prosecutorial misconduct); Campbell v.

26  Kincheloe, 829 F.2d 1453, 1457 (9th Cir.1987)).  On habeas corpus review, allegations of

27  prosecutorial misconduct merit relief "only if the misconduct rises to the level of a due process

28  violation—not merely because [the reviewing court] might disapprove of the prosecutor's

1  behavior." <u>Towery v. Schiriro</u>, 641 F.3d 300, 306 (9th Cir. 2010).

2       The question to be resolved is whether the alleged prosecutorial misconduct "'so infected

3  the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Hall v.

4  Whitley</u>, 935 F.2d 164, 165 (9th Cir. 1991) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637,

5  643, 94 S.Ct. 1868, (1974)).  In order to determine whether misconduct occurred, it is necessary

6  to examine the entire proceedings and place the prosecutor's conduct in context.  <u>Greer v. Miller</u>,

7  483 U.S. 756, 765–766, 107 S.Ct. 3102 (1987).  Factors to be considered in determining whether

8  habeas corpus relief is warranted include whether the prosecutor manipulated or misstated the

9  evidence; whether his comments implicated other specific rights of the accused; whether the

10  objectionable content was invited or provoked by defense counsel's argument; whether the trial

11  court admonished the jurors; and the weight of evidence against the defendant.  <u>Darden</u>, 477 U.S.

12  at 181 (quoting <u>Donnelly</u>, 416 U.S. 637, 643, 94 S.Ct. 1868 (1974).  "[T]he <u>Darden</u> standard is a

13  very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case

14  determinations[]' (<u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004)) . . . ."

15  <u>Parker v. Matthews</u>, 132 S.Ct. 2148, 2155 (2012).  Thus, even where a prosecutor's argument,

16  questions or behavior are found improper, relief is limited to cases in which a petitioner can

17  establish that the misconduct resulted in actual, substantial prejudice

18       Moreover, prosecutors are afforded reasonably wide latitude in fashioning closing

19  arguments, <u>United States v. Birges</u>, 723 F.2d 666, 671–672 (9th Cir.1984), and are free to argue

20  "reasonable inferences from the evidence."  <u>United States v. Gray</u>, 876 F.2d 1411, 1417 (9th Cir.

21  1989).  "[P]rosecutors may strike 'hard blows,' based upon the testimony and its inferences,

22  although they may not, of course, employ argument which could fairly be characterized as foul or

23  unfair."  <u>United States v. Gorostiza</u>, 468 F.2d 915, 916 (9th Cir.1972).

24       B.  <u>Analysis</u>

25       Petitioner contends the prosecutor committed misconduct by improperly attacking defense

26  counsel and the role of the defense attorneys, shifting the burden of proof to the defense, and

27  appealing to the passion of the jurors.  The California Court of Appeal rejected this claim as

28  follows:

9

During her rebuttal argument, the prosecutor made the following statements:

"[T]here is this old saying that when the facts—if you're a defense lawyer, if the facts aren't on your side, argue the law. If the facts aren't on your side, argue the law [sic].

"If you haven't got either one on your side, attack the cops, attack the D.A. I'm not evidence. I'm one person here who has a job to do, which is to bring this evidence in before you for your consideration.

"Just because we have assembled for a trial, does not mean that there is a valid defense. And at the same time, we are very fortunate that in our country, nobody has to go through a trial charged with a crime alone. Everybody is entitled to an attorney.

"I believe in that. You believe in that. We're fortunate to live in a country where we have that type of freedom and that type of privilege and constitutional rights.

"But these lawyers, each of these lawyers are private attorneys. They're obviously very well experienced and—but the problem, nobody can come in here and say, gosh, looks like the evidence has shown that they're guilty. They can't say that."

At this point, defense counsel objected, but the trial court overruled the objection. The prosecutor continued:

"They can't do that, but they have to say something.

"But the lawyers, don't forget the lawyers, they're no more responsible for what happened on January 22nd than I am.

"You've heard—you've heard from the witnesses and you've heard and you've seen the evidence that tells you and talks to you about what happened on January 22nd, on January 23rd of 2007. That's our focus. That's our focus.

"And when you've heard the words about what the group did to her, what they did to her, things of this nature, it's appropriate for you to consider the experience and the testimony of Destiny Doe when she describes, yes, what they did to her, yes, what this group of people did to her.

"And you'll notice we talked in great specificity, also, too, about each person's individual role and in multiple defendant cases involved where people choose to aid and abet one another to commit these types of crimes, especially in a gang context and with this gang mentality, you have to consider all of that in conjunction with the rest of the evidence in finding each person's responsibility.

"Mr. Mahle [counsel for Griffin] commented several times, he kept saying something about [Doe] being interviewed 17 times and told—there's 17 versions of what she told you has happened. Well, that's simply not true. That is simply not true.

10

"Or Miss Huey [counsel for Merritt] saying that her story changes every time she's interviewed. The evidence does not support that. That is not true.

"Or attacking Sergeant Nutley and the integrity of his work as a professional. This is a man who does his job—basically what we learned here is this is a law enforcement professional who will go out there and do his job, and it doesn't matter whether you're the Governor or whether you're a homeless guy or whether you're a prostitute."

At this point, defense counsel again objected and the court again overruled the objection. The prosecutor continued:

"Or whether you're somebody's grandmother next door, he's got a job to go out and do because the focus is the protection of the community and to enforce the laws against parties who break them.

"So he treats her in a dignified and professional manner that she doesn't get in here."

Defense counsel again objected, and the court once again overruled the objection. The prosecutor continued:

"And is then slammed, you know, slammed by these belittling—."

Defense counsel once again objected and asked for a finding of misconduct. The court denied the request but sustained the objection to the phrasing of the prosecutor's argument. The prosecutor then resumed her argument:

"Like allowing [Doe] to meet him at Starbuck's, if a witness or a victim wants to meet an officer at a location rather than at their house, it's their prerogative. [¶] ... [¶]

"There is a lot of talk about Miss Doe's credibility, and of course you're going to evaluate the credibility of every witness. [¶] ... [¶]

"And it's not—it's interesting, Miss Huey said that we need to think about how—that [Doe] has a motive to lie or fabricate this whole event because she has a personal interest in how this case is resolved.

"Well, what exactly is that? ...

"What does she gain? The ability to have to look over your shoulder for the rest of your life.

"Miss Huey described Miss Doe as a wild cat on the witness stand during her cross-examination but crying her way through direct.

"Gosh, it's impossible to understand how anyone who's been a victim of a crime can come into court and even—."

11

Defense counsel again objected, but the court again overruled the objection.

Following the lunch break, the defendants moved for a mistrial based on prosecutorial misconduct. The court denied the motion.

Griffin contends the foregoing argument was improper for several reasons. First, Griffin argues the prosecutor accused defense counsel of fabricating a defense. Next, Griffin argues the prosecutor shifted the burden of proof to the defendants. Finally, according to Griffin, the prosecutor appealed to the passions of the jurors. Griffin further argues the foregoing misconduct affected the fundamental fairness of the trial and resulted in prejudice.

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." '" [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819, 72 Cal.Rptr.2d 656, 952 P.2d 673.)

The prosecution has a solemn obligation to protect a criminal defendant's constitutional right to a fair trial. (*Berger v. United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321].) "Improper remarks by a prosecutor can ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Frye* (1998) 18 Cal.4th 894, 969, 77 Cal.Rptr.2d 25, 959 P.2d 183, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, 87 Cal.Rptr.3d 209, 198 P.3d 11.) Nevertheless, a prosecutor has wide latitude in closing argument and may argue vigorously that the evidence shows the defendant is guilty of the crimes charged. (*People v. Mincey* (1992) 2 Cal.4th 408, 447–448, 6 Cal.Rptr.2d 822, 827 P.2d 388; *People v. Wharton* (1991) 53 Cal.3d 522, 567, 280 Cal.Rptr. 631, 809 P.2d 290.)

"[T]he prosecutor has wide latitude in describing the deficiencies in opposing counsels tactics and factual account." (*People v. Bemore* (2000) 22 Cal.4th 809, 846, 94 Cal.Rptr.2d 840, 996 P.2d 1152.) "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47, 18 Cal.Rptr.2d 796, 850 P.2d 1.)

Griffin cites three cases in support of his misconduct claim. In *People v. Bain* (1971) 5 Cal.3d 839, 97 Cal.Rptr. 684, 489 P.2d 564 (*Bain*), the defendant, a black man, was charged with various sex offenses committed against the victim and the defendant claimed the victim was a "pick-up" who accompanied him willingly. (*Id.* at pp. 843–844, 97 Cal.Rptr. 684, 489 P.2d 564.) The prosecutor, also

a black man, "asserted before the jury that the defendant and his counsel had fabricated the 'pick-up' story; he stated that he, as a black man, would not be prosecuting a black defendant unless he personally believed the man to be guilty; he attacked the integrity of the defense attorney and the office of the public defender; and he referred repeatedly to racial matters." (*Id.* at p. 845, 97 Cal.Rptr. 684, 489 P.2d 564.)

The Supreme Court found misconduct both as to the assertion that the defendant and counsel had fabricated a defense during the three-month period prior to trial and as to the prosecutor's assertion of a personal belief in the defendant's guilt without any disclaimer that this was based solely on the evidence presented at trial. (*Bain*, *supra*, 5 Cal.3d at pp. 847–848, 97 Cal.Rptr. 684, 489 P.2d 564.) As to the latter, "a prosecutor is free to give his opinion on the state of the evidence, and in arguing his case to the jury, has wide latitude to comment on both its quality and the credibility of witnesses. [Citations.] It is misconduct, however, to suggest to the jury in arguing the veracity of a witness that the prosecutor has information undisclosed to the trier of fact bearing on the issue of credibility, veracity, or guilt. The danger in such remarks is that the jury will believe that inculpatory evidence, known only to the prosecution, has been withheld from them." (*People v. Padilla* (1995) 11 Cal.4th 891, 945–946, 47 Cal.Rptr.2d 426, 906 P.2d 388, overruled on other grounds in *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1, 72 Cal.Rptr.2d 656, 952 P.2d 673.) In *Bain*, the prosecutor did not just express his belief in the defendant's guilt but asserted he would not have pressed charges against the defendant if he did not believe he was guilty. Thus, even before the evidence was presented to the jury, the prosecutor believed the defendant was guilty, which belief obviously could not have been based on the evidence presented at trial. (*Bain*, *supra*, 5 Cal.3d at p. 848, 97 Cal.Rptr. 684, 489 P.2d 564.)

In *People v. Charlie* (1917) 34 Cal.App. 411, 167 P. 703 (*Charlie*), the defendant was charged with assault and the prosecutor questioned the defendant about why he had not given testimony supporting his claim of self-defense at the preliminary hearing, where he testified without the aid of counsel. (*Id.* at p. 414, 167 P. 703.) In commenting to the jury on this disparity in the defendant's testimony, the prosecutor said: " 'That was defendant's testimony down before the magistrate, and if it was not the truth it came pretty near being. That was before he had any attorneys to tell him it was not true. When he got attorneys, they said to him, "We can make a fine self-defense case out of this, so you say that you saw the knife; you must tell that all the time, and we will put Oakley ... on the stand to corroborate you, and we have got a good case." ' " (Id. at pp. 414–415, 167 P. 703.) The Court of Appeal concluded these remarks were not warranted by anything in the record and were improper. (Id. at p. 415, 167 P. 703.)

In *People v. McCracken* (1952) 39 Cal.2d 336, 246 P.2d 913 (*McCracken*), the defendant was prosecuted for child stealing, kidnapping and murder of a 10–year–old and claimed the victim died as a result of an accident, which he described at trial in some

detail. However, when first asked about the matter, the defendant denied having seen the victim at all. (*Id.* at pp. 338–341, 246 P.2d 913.) During argument to the jury, the prosecutor asserted the accident defense did not originate from the mind of the defendant himself, thereby suggesting it had been fabricated by defense counsel. (*Id.* at p. 348, 246 P.2d 913.) The high court found this argument to be "highly improper" (*id.* at p. 349, 246 P.2d 913), but ultimately concluded it was not prejudicial in light of the evidence against the defendant, defense counsel's objections, and admonitions given by the court (*ibid.*).

Griffin contends the prosecutor in this matter committed the same misconduct illustrated by the foregoing cases, thereby shifting the burden of proof to the defense and appealing to the passions of the jurors. Griffin points out that the prosecutor asserted the defense presented was not "valid" and that defense counsel was unable to say their clients were not guilty. According to Griffin, the prosecutor implied defense counsel was lying and appealed to the jury's passions by asserting defense counsel treated Doe in an undignified manner.

We find no misconduct. The first objection by the defense came after the prosecutor said that simply because there is a trial does not mean the defendants have a valid defense and defense counsel cannot come into court and admit that their clients are guilty. There is nothing improper in the prosecution asserting the defendants have no defense to the charges. This is simply another way of saying they are guilty. There is no shifting of the burden of proof. As for asserting that defense counsel cannot admit their clients are guilty, this is a true statement, in light of the defendants' not guilty pleas. This does not imply, as Griffin apparently assumes, that defense counsel believed their clients are guilty.

The next objection came after the prosecutor denied that Doe had changed her version of the events each time she was interviewed and asserted that Sergeant Nutley, the lead investigator who interviewed Doe a number of times, treated her the same as he would have the Governor, notwithstanding the fact Doe was a prostitute. The basis of the defense objection is not stated on the record. However, to the extent Griffin contends this was improper vouching for a witness, it was not.

The next objection came after the prosecutor said Sergeant Nutley treated Doe in a dignified and professional manner "that she doesn't get in here." Again, the basis for the objection is not stated. However, to the extent the prosecutor was implying that defense counsel did not treat Doe in a dignified manner, there is nothing improper in this. Despite having repeatedly admitted that she was working as a prostitute at the time and still does, Doe was questioned over and over again by defense counsel about these matters. At one point, one of the defense attorneys inadvertently referred to Doe as Ms. Smith and was corrected by the prosecutor. Defense counsel then spelled the name out as "D-o-u-g-h," to which Doe responded, "That's not funny." The court admonished defense counsel about use of the fictitious "Doe" designation. Doe was also

14

belittled about her claim that she worked as a preschool teacher, since she did not in fact have a teaching credential and was no more than a teacher's aide. She was further questioned about the change in her hairstyle for trial and her use of the word "relevant" in response to a question during direct examination, in light of her lack of legal training. Doe responded, "I'm not stupid, thank you." Thus, the prosecutor was merely responding to the treatment given the victim by defense counsel.

The next objection came after the prosecutor asserted that Doe was "slammed" and belittled. Although the court denied the request for a finding of misconduct, it did sustain the objection to the phrasing of the comment.

The final objection came after the prosecutor stated: "Gosh, it's impossible to understand how anyone who's been a victim of a crime can come into court and even—." Defense counsel objected that this "misstates the burden" and the court overruled the objection. We see no basis for concluding this comment somehow shifted the burden to the defendants.

In *Bain*, the prosecutor asserted the defendant and his counsel had fabricated their defense and further assured the jury he would not have prosecuted the defendant if he did not believe he was guilty, without explaining the basis for that belief. In *Charlie*, the prosecutor asserted the defendant changed his story between the preliminary hearing, when he was unrepresented, and trial, when he was represented by counsel. The prosecutor asserted defense counsel instructed his client to assert he had seen the victim with a knife. In *McCracken*, the prosecutor asserted that the defendant's accident defense did not originate in his own mind, thereby inferring it had been fabricated by defense counsel.

The present matter does not involve anything even remotely approaching what occurred in those three cases. The prosecutor did no more than assert the defendants had no valid defense and chided defense counsel for having treated the victim roughly. This is not misconduct.

<u>Kidd</u>, 2012 WL 243250 at \*\*24–29.

Petitioner repeats the arguments he made on his state court direct appeal here in his federal petition. He contends the prosecutor committed misconduct by improperly attacking defense counsel and the role of the defense attorneys, shifting the burden of proof to the defense, and appealing to the passion of the jurors. Specifically, petitioner asserts the prosecutor accused defense counsel of fabricating the defense (9 RT 2454 ["Just because we have assembled for a trial, does not mean that there is a valid defense"]), lying (9 RT 2455 ["But these lawyers, each of these lawyers are private attorneys. They're obviously very well experienced and – but the

15

1   problem, nobody can come in here and say, gosh, looks like the evidence has shown that they're

2   guilty.  They can't say that.]), and demeaning counsel's treatment of a witness (9 RT 2457

3   [stating that the interviewing officer treated the victim in a dignified and professional manner that

4   she did not receive from defense counsel]).  Petitioner's objections regarding the prosecutor's

5   comments about defense counsel and the validity of petitioner's defense do not amount to a due

6   process violation as "[c]riticism of defense theories and tactics is a proper subject of closing

7   argument."  See United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997) (citation

8   omitted).  Indeed, prosecutors have taken more egregious shots at defense counsel and have been

9   found not to have committed misconduct.  See e.g., U.S. v. Del Toro-Barboza, 673 F.3d 1136,

10  1151 (9th Cir. 2012) (characterizing defense strategy as "the Wizard of Oz trick"); United States

11  v. Ruiz, 710 F.3d 1077, 1086 (9th Cir. 2013) (characterizing defense case as "smoke and mirrors"

12  directed to defense case and not counsel); Williams v. Borg, 139 F.3d 737, 744–45 (9th Cir.

13  1998) (calling defendant's argument "trash" not misconduct; "He did not say the man was 'trash';

14  he said the argument was.  A lawyer is entitled to characterize an argument with an epithet as well

15  as a rebuttal."); but see, United States v. Sanchez, 659 F.3d 1252, 1224 (9th Cir. 2011)

16  (misconduct where the prosecutor argued: "the defense [counsel] in this case read the records and

17  then told a story to match the records.  And ladies and gentlemen, I'm going to ask you not to

18  credit that scam that has been perpetrated on you here.").

19         Petitioner also asserts that the prosecutor improperly shifted the burden of proof to the

20  defendants in the following statements:

21              Miss Huey described Miss Doe as a wildcat on the witness stand
                during her cross-examination but crying her way through direct.

22

23              Gosh, it's impossible to understand how anyone who's been a
                victim of a crime can come into court and even –

24  9 RT 2460.  Defense counsel objected on the grounds that the argument misstates the burden of

25  proof because it suggests that the Miss Doe "was crying because she was the victim of a crime

26  when it's [the prosecution's] burden to prove that she was a victim."  Id. at 2469.  The

27  undersigned, like the California Court of Appeal, has difficulty determining how the prosecutor's

28  statements regarding Miss Doe amount to improper burden-shifting.  Indeed, in beginning her

1    rebuttal argument, the prosecutor explained that "the party that has the burden of proof speaks

2    first and is allowed to have to opportunity to make a rebuttal argument to a jury." Id. at 2448.

3    The state court's determination that there was no improper burden shifting in the prosecution's

4    rebuttal argument was not unreasonable.

5         Petitioner further asserts that the prosecutor improperly appealed to the passion of the jury

6    when she accused defense counsel of treating Ms. Doe in an undignified and unprofessional

7    manner and when she invited the jury to find the defendants guilty because Ms. Doe was crying

8    on the witness stand.  9 RT at 2457, 2460.  The Court of Appeal was not unreasonable in finding

9    that the prosecutor's statements regarding defense counsel's treatment of Ms. Doe were merely a

10   response to treatment actually given.  See 3 RT 702 (defense counsel referencing Ms. Doe

11   initially lying to police officer about being a prostitute); 704 (suggesting prostitution as a reason

12   defendants went to her house); 741 (defense counsel against referencing Ms. Doe's work as a

13   prostitute); 744 (same); 769 (referencing Ms. Doe's conviction for prostitution in New Orleans);

14   770 (whether Ms. Doe's family knew that she was a prostitute); 820 (asking whether Ms. Doe had

15   legal training because she used the word "relevant"); 827 (asking whether Ms. Doe had

16   performed escort services the day she was kidnapped, sexually assaulted, and shot); 862 (defense

17   counsel inadvertently calling the witness Ms. Smith as opposed to Ms. Doe and after being

18   corrected, spelling the name out as "D-o-u-g-h"); 866 (at the time she testified she was still

19   performing work as a prostitute).  "[I]f the prosecutor's remarks were 'invited,' and did no more

20   than respond in order to 'right the scale,' such comments would not warrant reversing a

21   conviction." United States v. Young, 470 U.S. 1, 12–13, 105 S.Ct. 1038 (1986).  Petitioner's

22   characterization of the prosecutor's statements regarding Ms. Doe crying on the witness stand as

23   an invitation of guilt is another way of stating that the prosecution improperly shifted the burden

24   of proof by calling Miss Doe a victim.  As explained above, the undersigned has difficulty

25   determining how such a statement would equate to improper burden shifting or improper appeal

26   to the passion of the jury.

27        Petitioner also contends the prosecutor misstated the law on aider and abettor liability in

28   her closing argument.  The Court of Appeal rejected this claim on direct appeal as follows:

Griffin contends the prosecutor's arguments incorrectly led the jury to believe it could convict an individual defendant on the basis of group liability rather than individual liability. Griffin points out that an individual aider and abettor can be held liable for a crime only if he or she had the requisite intent and, therefore, an aider and abettor can have a lesser level of culpability than the person who commits the crime. According to Griffin, the prosecutor improperly led the jury to believe all parties share guilt equally. Griffin misreads the prosecutor's arguments.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.] To be guilty of a crime as an aider and abettor, a person must 'aid[ ] the [direct] perpetrator by acts or encourage[ ] him [or her] by words or gestures.' [Citations.] In addition, except under the natural-and-probable-consequences doctrine [citations], which is not implicated on the facts presented here, the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must "know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime." [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623–624, 3 Cal.Rptr.3d 402, 74 P.3d 176.)

Because an aider and abettor must himself or herself have the requisite mental state to commit the attempted crime, his or her liability may be different from that of the actual perpetrator. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1114, 108 Cal.Rptr.2d 188, 24 P.3d 1210.) Of course, the line between an actual perpetrator and an aider and abettor is often blurred. (*See People v. Calhoun* (2007) 40 Cal.4th 398, 402, 53 Cal.Rptr.3d 539, 150 P.3d 220.) One acting in concert with another to commit a crime may be both perpetrator and aider and abettor at the same time.

Griffin contends the prosecutor's arguments were inconsistent with the foregoing principles. The prosecutor began her argument to the jury as follows: "Long before this was ever our case, this was already a gang case. These defendants, independent of one another and together, had made conscious decisions to become 29th Street Crip gangsters or commit crimes with them. If we've learned anything from Detective Bell and Zachary Tyler's testimony as well, we know that the 29th Street Crip—Crip gang members are committed to a lifestyle of crime. They're committed to backing

each other's play, whatever it may be. Long before they ever went over to the residence on Belleau Wood Lane, they had already contemplated crimes like these and a host of other crimes that they were willing to commit in the name of the 29th Street Crips."

At this point, the defense objected, but the objection was overruled. The prosecutor continued: "When this home invasion started leading to kidnapping and almost murder, it doesn't matter whose idea it was or whether they discussed it each step of the way. When they car caravanned over to that home intent on robbing and smoking another human being, they acted as one. They acted on intentions that they have harbored on a daily basis for a long time. That's not to say that gang members can't have other lives as well. But when they're out there with their homeboys in the street, they're not Mr. Tyler or Ms. Merritt in a dress shirt and tie or lace and a pretty sweater, they're Smash and Lady Smash with guns and blue bandanas concealing their faces."

Griffin contends the foregoing is an improper argument regarding propensity to commit crimes based solely on gang status. He further contends the argument implies that each defendant harbored the same intent simply because they were gang members.

We find no misconduct in the prosecutor's argument. The jury was properly instructed that aider and abettor liability requires a finding of knowledge of the perpetrator's intent to commit the crime and specific intent to aid and abet the perpetrator in committing the crime. The prosecutor's argument did not say the jury need not find the aider and abettor specifically intended that the perpetrator commit the crime. Rather, the prosecutor argued the jury could infer such intent based in part on gang status. In other words, the fact that each defendant was a member of a criminal street gang, coupled with the fact they accompanied each other to the crime scene, may be used to infer the requisite intent. Since there is rarely ever direct evidence of intent, this was a proper comment on the evidence, especially in light of the expert testimony presented by the prosecution on gang culture.

Much later, the prosecutor argued: "Everybody aided and abetted in this offense [attempted murder]. It is—the law recognizes under circumstances like ours it's—it's as if everybody is the shooter, 'cause everyone shares responsibility for the attempted murder."

Griffin contends this argument contradicts the principle that each party's culpability must be judged individually. Again, we disagree. The prosecutor was merely asserting that the evidence showed each of the defendants was an aider and abettor in the crime of attempted murder. This is no more problematic than if the prosecutor had said the evidence showed Griffin fired at Doe with the intent to kill her. The prosecutor's statement that it is as if each defendant was the shooter is not a misstatement of the law. Once it is established that a particular defendant was an aider and abettor in the crime of attempted murder, the law treats that person as if he or she was the perpetrator. However, it must first be established that the person was an aider and abettor.

19

Griffin next challenges the following argument: "[The] State of California's also gonna ask that you find that this attempted murder was done with premeditation and deliberation. Premeditation and deliberation. You're gonna hear the word used—what's called a principal, that a principal—it's just a legal word. A principal is someone who's responsible for a crime. So it's either a person who's directly responsible like the shooter, or it's a person who aids and abets the attempted murder. Both people are principals in the crime, both people share responsibility for it. [¶] So you're going to hear the word, a principal, that's what it means. And you have to find premeditation and deliberation for everybody." (Italics added.)

Griffin contends the prosecutor was wrong to say the jury had to find premeditation and deliberation for everybody. According to Griffin, such finding may be different as to each defendant.

Griffin misreads the quoted statement. The prosecutor was not saying the jury was required to make a finding that all defendants premeditated and deliberated the attempted murder. In other words, the prosecutor did not say that if one premeditated and deliberated, they all did. Rather, the prosecutor was saying the jury must make a finding on the issue of premeditation and deliberation as to each defendant. Those findings may be different.

Finally, Griffin takes issue with the following statement by the prosecutor during rebuttal: "And you'll notice we talked in great specificity, also, too, about each person's individual role in multiple defendant cases involved where people choose to aid and abet one another to commit these types of crimes, especially in a gang context and with this gang mentality, you have to consider all of that in conjunction with the rest of the evidence in finding each person's responsibility."

Griffin again asserts the prosecutor was referring here to "'group guilt'" for gang members. We disagree. The cited passage says nothing more than that gang status may be taken into consideration in deciding whether any one defendant is responsible for a particular crime. This is not contrary to the law.

Kidd, 2012 WL 243250 at **29–31.

This misconduct claim is predicated on a misstatement of state law. "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76, 126 S.Ct. 602 (2005), (citing Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S.Ct. 475 (1991); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881 (1975)).  The Court of Appeal found that the prosecutor's argument did not misstate California aider and abettor law.  Kidd, 2012 WL 243250 at *30.  The undersigned is bound by that conclusion.  Furthermore, the asserted misconduct must

result in actual, substantial prejudice.  The Court of Appeal found that the jury was properly

instructed on the aider and abettor liability and that the prosecutor's argument did not veer from

this instruction.  Id. at **30–31.

In sum, the state court decision was not contrary to, or an unreasonable application of,

clearly established federal law.  Relief should be denied on petitioner's prosecutorial misconduct

claims.

III.     Insufficient Evidence

Petitioner contends that his due process rights had been violated because his conspiracy to

commit murder conviction was not supported by sufficient evidence.  The Court of Appeal

rejected this claim on direct appeal as follows:

> Griffin contends there is insufficient evidence he entered into a
> conspiracy to murder Doe. Griffin acknowledges there was an
> agreement among the defendants to commit a robbery but "the co-
> defendants were not of a single mind about the rest of the evening."
> Doe testified that Griffin, unlike the others, was quieter and more
> polite to her. Thus, he argues, "one cannot infer from his behavior
> after the robbery that he necessarily was in agreement with the
> other co-defendants for the rest of the evening." In fact, Doe
> testified that when they left the home of A.S., Tyler and Griffin told
> her they were taking her home. She also told Detective Nutley that
> Tyler and Griffin were opposed to hurting or killing her. Griffin
> further points out that Doe's testimony was uncertain as to who
> actually shot at her. According to Griffin, while the jury could have
> found he joined at the last minute in the attempt to murder Doe,
> "the evidence does not support the inference beyond a reasonable
> doubt that he joined in an agreement to kill before-hand."
>
> "A conspiracy is an agreement between two or more people to
> commit a public offense." (People v. Herrera (1999) 70
> Cal.App.4th 1456, 1464, 83 Cal.Rptr.2d 307.) It requires not only a
> specific intent to agree to commit a public offense but a further
> specific intent to commit the offense itself. (People v. Superior
> Court (Quinteros) (1993) 13 Cal.App.4th 12, 20, 16 Cal.Rptr.2d
> 462.) It also requires proof of an overt act committed by one or
> more of the conspirators in furtherance of the object of the
> agreement. (Ibid.)
>
> "The agreement or the unlawful design of [the] conspiracy may be
> proved by circumstantial evidence without the necessity of showing
> that the conspirators met and actually agreed to commit the offense
> which was the object of the conspiracy." (People v. Superior Court
> (Quinteros), supra, 13 Cal.App.4th at p. 20, 16 Cal.Rptr.2d 462.)
> "While mere association does not prove a criminal conspiracy
> [citation], common gang membership may be part of circumstantial
> evidence supporting the inference of a conspiracy. [Citation.] The

21

circumstances from which a conspiratorial agreement may be inferred include 'the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties [and] the interests of the alleged conspirators....' [Citation.]" (*Id.* at pp. 20–21, 16 Cal.Rptr.2d 462.)

Here, in addition to a common gang membership among the alleged conspirators, the evidence showed defendants got together to discuss what was to be done with Doe. Although there may have been disagreement among them, eventually they embarked on a course of action that involved taking Doe to a field, releasing her and then taking shots at her as she attempted to flee. From this evidence alone, a reasonable jury could infer defendants agreed to kill Doe before they ever left the home of A.S. Hence, substantial evidence supports Griffin's conviction for conspiracy to commit murder.

Kidd, 2012 WL 243250 at *32.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution. Jackson, 443 U.S. at 319, 99 S.Ct. 2781. . . [W]hen "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326, 99 S.Ct. 2781; see also McDaniel, 130 S.Ct. at 673–74.

Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S.Ct. 2781.

[¶] . . .[¶]

At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to

22

1    establish every element of the crime beyond a reasonable doubt."
     See id.

2

3    Id. at 1164–65.

4         Superimposed on these already stringent insufficiency standards is the AEDPA

5    requirement that even if a federal court were to initially find on its own that no reasonable jury

6    should have arrived at its conclusion, the federal court must also determine that the state appellate

7    court could not have affirmed the verdict under the Jackson standard in the absence of an

8    unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

9         A federal habeas court determines sufficiency of the evidence in reference to the

10   substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at

11   324 n. 16; Chein, 373 F.3d at 983.  To show that petitioner was guilty of conspiracy to commit

12   murder under California law, the prosecution was required to show that: (1) petitioner and his co-

13   defendants entered into an agreement to unlawfully kill Doe; (2) each specifically intended to

14   enter into an agreement to kill a human being; (3) each of them harbored a specific intent to kill;

15   and (4) one or both of them committed an overt act in furtherance of the agreement.  See, e.g.,

16   People v. Cortez, 18 Cal.4th 1223, 1229, 77 Cal.Rptr.2d 733, 960 P.2d 537 (1998); People v.

17   Swain, 12 Cal.4th 593, 612–13, 49 Cal.Rptr.2d 390, 909 P.2d 994 (1996).

18        Petitioner concedes that there was an agreement to commit robbery at Belleau Woods but

19   contends that the co-defendants were not in agreement about the rest of the evening, in particular

20   with respect to what to do with Ms. Doe.  Petitioner notes Ms. Doe described his treatment of her

21   as more polite, less verbally abusive and less aggressive than the other co-defendants.  3 RT 806–

22   07.  Ms. Doe also reported to Detective Nutley that petitioner was opposed to hurting or killing

23   Ms. Doe.  Id. at 808–09.  Petitioner also notes that the record does not indicate whether the parties

24   reached any agreement at the last house and that Ms. Doe was unclear whether she saw two

25   shooters or one shooter and whether one of the shooters was co-defendant Kidd or someone else.

26   Id. at 681, 832, 834; 5 RT 1289–90.  In sum, petitioner contends that his relative kindness to Ms.

27   Doe prior to the shooting, the lack of direct evidence of an agreement to kill Ms. Doe, and Ms.

28   Doe's inability to identify whether there were one or two shooters do not support the inference

1   that petitioner joined in an agreement to kill Ms. Doe.  To the contrary, based on the evidence in

2   the record as more fully discussed below, a rational trier of fact could find the essential elements

3   of conspiracy to commit murder beyond a reasonable doubt.

4        Respondent contends that the Court of Appeal's rejection of petitioner's sufficiency of

5   evidence claim was neither contrary to, nor an unreasonable application of Jackson.  The

6   undersigned agrees.  The Court of Appeal identified the elements of the crime of conspiracy to

7   commit murder and explained how circumstantial evidence, including common gang

8   membership, the conduct of the defendants, the nature of the act done, the relationship of the

9   parties and the interests of the alleged conspirators, could be used to prove an agreement or

10  unlawful design.  Kidd, 2012 WL 243250 at *32.

11       The evidence shows that petitioner and his co-defendants were either members, associates,

12  or allies of a criminal street gang called the 29th Street Crips.  See e.g., 6RT 1688–93 (gang

13  expert opined petitioner was a member of the 29th Street Crips); 6RT 1694–95 (gang expert

14  opined defendant Jordan Kidd was a member of the Valley High Crips); 6 RT 1697–98 (gang

15  expert opined defendant Kimberly Knorr was an associate of the 29th Street Crips); 6 RT 1701–

16  05 (gang expert opined defendant Zachary Tyler was a member of the 29th Street Crips).

17       The record also supports the inference that the group, through their conduct, reached an

18  agreement to murder Ms. Doe.  As Ms. Doe testified, petitioner, Tyler, and Kidd took her and put

19  her back in the car, after she had been sexually assaulted.  3 RT 671–73.  She testified that

20  petitioner and Kidd were holding guns.  Id. at 674.  They took her to another house, had her sit in

21  a recliner, and went into another room to talk.  Id. at 676–78.  After several minutes, they took

22  Ms. Doe and placed her in the backseat of the car between petitioner and Kidd.  Id. at 679.  Tyler

23  drove the group to an empty field and parked.  Id. at 680.  Petitioner and Kidd exited the car and

24  told Ms. Doe to get out and walk home, pointing towards the field.  Id.  As Ms. Doe walked

25  through the field, she heard gunshots.  Id. at 681.  She testified that she looked back toward the

26  car and saw two men pointing their guns at her.  Id.  Based on this testimony, a reasonable jury

27  could infer that at the last house they visited, petitioner reached an agreement with his co-

28  defendants to kill Ms. Doe.  Petitioner's sufficiency of the evidence claim should be denied.

CONCLUSION

For all the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitution right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.   Petitioner's application for a writ of habeas corpus be denied; and

2.   The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a documents should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 14, 2014

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:016/Grif2516

25